Bus number 24-1036 from the District of Eastern Missouri, Tashonda Troupe v. St. Louis County, Missouri at all. Mr. Pedroli, when you're prepared, please proceed. When you're prepared, please proceed. I apologize for the audio. I don't know where that's coming from. I believe I've had the static experience before. I'm just going to wait until she's out there. Madam Clerk, you might want to summon someone. Well, it may take a moment for someone to get here, so we'll go ahead and proceed if you're prepared. We don't think it'll distract from our ability to talk. I'd rather not listen to that and counsel at the same time. Thank you. There we go. My mic? When I muted it, it goes away. I don't know why. Demons. Appointments. Don't worry, I'll speak loudly when I have a question. May it please the Court. My name is Mark Pedroli. I represent Tashonda Troupe. This is a 1983 case regarding her 20-year-old son, Lamar Ketchings, who died in the St. Louis County Jail on March 1, 2019. Your Honors, this is a case about a 12B6 dismissal of many, all of the jail guard defendants, appellees in this case, including the person that ran the nurses, Dr. Doucette. On point one, we have three points, Your Honors. Ms. Troupe challenges the District Court's dismissal of numerous defendants, including all the jail guards and Dr. Doucette. The District Court essentially ruled that the jail guards reasonably relied upon the nurses who visited Mr. Ketchings, without allowing us any discovery whatsoever to determine whether or not... I thought discovery was available throughout the period of time. Your opponents both say that. Is that true or false? Throughout the period of time, meaning... From when it was filed until the ruling. No, Your Honor, we were not allowed to do that. A year and a half, you had the opportunity to do discovery. From our understanding, Your Honor, we had not had a Rule 16... Was there a court order saying you couldn't or not? Because you know how it is, it's counsel initiated. Go ahead. From our understanding, we weren't allowed to conduct any discovery until after a Rule 16 conference in the Eastern District of Missouri. Is that the local rule? Help me if that's the local rule. I don't know if it's the local rule, but it's what we understand to be the rule that you cannot conduct discovery. Counsel rules are usually black and white, and so does the rule say you can do it or not? Like you can, you know, in most cases, it's counsel initiated. Can you cite something to us in the record indicating that you were prohibited from taking discovery? Perhaps. It's my understanding, Your Honors, that we weren't allowed to conduct any discovery until after the motions to dismiss were ruled upon. If I'm mistaken, I am potentially mistaken, but it's my understanding that we could not conduct any discovery. Written discovery... Did you ever attempt to? I don't know if we did, Your Honor. Send in interrogatories or get notice of a deposition, any of that? It was a while ago, and I'm not sure if we did. I don't suspect that we did file any notices of depositions prior to the time that the motion was ruled upon. I'm an old plaintiff's lawyer, and I'm trying to figure this out. Is there a custom of practice in St. Louis County that somebody files a case, and if you don't get a scheduling conference, that you sit around and wait for over a year before somebody starts doing something? That seems like an unusual practice to me. The time that it took to rule on this was unusually long. There were several phone calls related to it and whether or not we were going to have a Rule 16. The 12B6 motion was filed before the scheduling conference was ever contemplated? Yes, and it is the custom in the Eastern District of Missouri that you aren't to conduct discovery until after the Rule 16 is had. That's always been my understanding, and if we ever do attempt, typically there's a motion for a stay filed, which is almost always granted, and sometimes some written discovery may be allowed. There's been a case where we had that. But typically if we serve discovery in these cases, prior to the Rule 16 and prior to a ruling on the motion to dismiss, we get stayed. And that's why some plaintiffs, frankly, prefer state court filings prior to filing a federal court, because there is no delay in getting the discovery, and we can start getting it right away. And I do think it's a concern in the Eastern District of Missouri. Counsel, you have to raise these things to gripe about them on appeal. Okay, you're on. Just bluntly. You've got to raise that kind of issue. I'm more familiar with state court practice, obviously. Yes. You've got to raise them to gripe about them on appeal. Proceed. I understand. Yes. And if I can proceed, I think that that might be irrelevant to the issue in front of us today, which is whether or not these guards should have been dismissed and Dr. Doucette should have been dismissed based on a conclusion in the complaint by the district court that these guards reasonably relied upon Nurse Young. Now, Lamar Catchings had been dying of leukemia for weeks, a month, and he had been suffering greatly and getting worse and worse. The last time the nurse saw him, Nurse Young, was on January or February 26th. Mr. Young, or I'm sorry, Mr. Catchings didn't die for three more days. So for three days, the only people who saw him were the guards. The guards all knew that Lamar Catchings was sick, but the judge, for whatever reason, made the determination that the guards could reasonably rely on this nurse. Now, why would you be able to reasonably? And later we did do discovery because one of the nurses was not dismissed. So there was discovery in this case. And I think what we have done is we have proven that the allegations that we made initially when we filed the complaint were plausible. They were plausible. And we proved that by later getting an affidavit, for example, from one of the appellees, Lieutenant Muller, who essentially said- He's the one who asked for help too, right? I'm sorry? He's the one who asked for help. Lieutenant Muller? Yeah. Muller and Williams both asked for help. Right, they did. Are they still defendants in this case? Well, Your Honor- Counsel, are they still defendants in this case on appeal, yes or no? Yes. How can they be? You mean because they asked for help? Yeah, right. Because I don't think- They didn't reasonably rely on Young. They asked for help. Right, they did. And they got no help. They got a nurse that came up and said- Yeah, but this is personal liability in 1983 cases. Right. So tell me-  I don't see how they can be in several others that you- We think there's- As best my clerk can figure out. We think there's an ongoing obligation. In other words, you can't just ask for help once and then realize that the nurse who came is hostile, angry, and is providing no help, and then to do nothing else, and then wait three days- How many of the guards asked for help or something like that? I know about those two for sure. Well, we know that a couple of guards were concerned and were critical of Nurse Young. But we think that goes to the fact that it wasn't reasonably- that they couldn't have reasonably relied on Nurse Young. They should have done something else. Instead of saying, well, it's Nurse Young's issue, and Nurse Young said he's faking, they should have said, like they did in their affidavit, there's no way he's faking. We know he's not faking, and they should have done something else. But they didn't- That sounds like a negligent standard, doesn't it? Well, we think that that's a deliberate indifference issue. We think that they were aware of a serious medical need. Someone who was throwing up and sick for three weeks couldn't get out of his cell, 20 years old, and that we believe that they were deliberately indifferent because in those subsequent three days, no one did anything about it. We believe that if you have a nurse that comes in and curses the patient and says all these terrible things to him, and the lieutenants and the officers hear this, it's their responsibility then to do something to ensure he gets the medical care that he needs. They can't just say, okay, and then move on because what they did ultimately was nothing. And by doing nothing, Mr. Catchings ultimately died. And that's, I think, the big issue. Counsel, would you move on to the claims against Dr. Doucette and the county? So again, this is simply a matter of pleading, a pleading standard. We sufficiently pled failure to train, supervise, or discipline. We think it was very adequately pled when it comes to Dr. Doucette. For example, Dr. Doucette had admitted in subsequent depositions that she did not supervise anyone, even though it was well known throughout the jail that people were not following her standing orders. She had standing orders. She knew that the nurses had to abide by them. In this case with Mr. Catchings, three times he was visited, and all three times her standing orders were violated, written standing orders telling the nurses what to do. Each time they were violated, we pled, and we pled, that she knew that this was a routine practice in the jail and that no one was doing anything about it to make sure to train and to supervise and to discipline the nurses. And by failing to do so, Mr. Catchings died because they felt free to disregard these standing orders. And she was doing nothing about it. We pled that. Again, this is not a summary judgment case, so we didn't get the evidence that we believe we need to sort this out in summary judgment. So essentially, all appellant is asking for today is a ruling that says that the complaint was adequately pled, that it was a long complaint with lots of context, lots of history, the Monell claims against St. Louis County. And we believe that it was plausible and it showed even a likelihood of liability with regard to some of these folks. But the critical issue is that this should have been decided upon on summary judgment. Deposition should have been taken with regard to all of these jail guards, which we didn't do. And at that point, with evidence, the court should have done that. There are papers written and cited in our brief that only 0.6% of cases are dismissed on qualified immunity at the 12B6 stage. That's a very low number for a very good reason. And we quote other court judges like Judge Easterbrook, who says it's very dangerous to do this at the motion to dismiss stage. The qualified immunity should typically be done at the summary judgment stage to allow appellants simply the opportunity to do discovery on their case. Does that survey take into account whether discovery was had in any of those cases? I'm sorry? That survey that you tell us about, the 0.6 number, and those cases that are reviewed there, what's the percentage of those cases that had discovery? I don't think any, but I don't want to be quoted on that because it's been a while since I actually read that whole law review article. But I don't think any. I think typically when you do discover you have depositions, that's evidence. And that means you go on to the summary judgment stage where you start to analyze the evidence and weigh it and balance it. We're only looking for an opportunity to weigh and balance the evidence. And if I can, I'd like to reserve the remainder for three minutes. Thank you, Your Honors. Thank you, Mr. Pedrola. Ms. Britt. May it please the Court. Thank you, Your Honors. My name is Portia Britt, and for the sake of brevity, I will represent that I represent all appellees save Dr. Doucette. Before I begin, I would like to just briefly address the discussion that the panel was having with counsel in regards to Rule 16 conferences and discovery in the Eastern District. If the Court would allow me some leeway, I will point out that even though this case was not briefed, appellees did find a case out of the Eastern District from 2018 stating that Rule 26 does not prohibit discovery prior to a Rule 16 conference. So there is. Is this your court opinion? Yes, Your Honor. And what's the case name? It is Hanover Insurance Company v. Harding Enterprises, LLC. And for our clerks, would you do a 28-J letter? Yes, Your Honors. So that to say that there is precedent in the Eastern District for saying that appellee, sorry, appellant was not obligated to wait for the Rule 16 conference to conduct discovery. Your Honors, as Judge Sippler correctly noted in his March 2022 order dismissing the federal claims against appellees, the fundamental question in this appeal was addressed in Whitney v. Guys, Inc. In Whitney, this court stated, the question is not whether plaintiff might at some later stage have been able to prove her claims. The question is whether plaintiff adequately asserted facts, not naked legal conclusions to support her claims. The answer to that question in this case is no. The District Court properly determined that appellant's second amended complaint was factually deficient and failed to meet the necessary facial plausibility. As such, the District Court did not err in its determination that all but two of the named appellees were entitled to qualified immunity, that appellants Morgan and Atwater were entitled to be dismissed for failure to state a claim, and that because appellant failed to plead sufficient facts of individual liability, Appellee County could not be held liable under a Monell theory. The court reviews de novo a District Court's grant of a motion to dismiss unqualified immunity and failure to state a claim. Counsel, was there any discussion before the District Court about the state of the discovery record or the absence of any discovery? Your Honor, I was actually not a part of this case when it was at the District Court level. I am not aware of any discussions that took place, but the fact of the matter is that appellant had the opportunity to raise discovery issues with the court, as Judge Benton pointed out, and that never occurred. To what extent, though, do you think the District Court was almost saying that information and belief allegations are not really favored in the Eighth Circuit? I bet you know about the footnote I'm looking at. Yes, Your Honor. I do not believe that the District Court was saying that they're not necessarily favored. I think that the District Court was trying to hold appellant to the standard that had been laid out by the Supreme Court in other cases in saying that it wasn't that the appellant didn't provide robust evidentiary support. The fact of the matter is that for many of these appellees, plaintiff didn't provide any or if she did, little evidentiary support. At the 12B stage, it's the quality of the allegation, isn't it, not evidence that's being admitted or proposed to be admitted. Correct, Your Honor. However, the fact is that, as the panel previously stated, appellant didn't even put forth sufficient facts to tie each of these individuals to even having seen Mr. Ketchings, having been assigned to his housing unit, having any interactions with him in order to put forth the argument that they sat and watched him slowly pass away and deteriorate in front of their eyes. You know, we've got this tension that exists at this point, and the tension is basically that we had some hostility towards information and belief pleadings at one time, right? I mean, I think that that's a fair characterization, and Judge Sippel was aware of that. Yes, Your Honor. But in 2023, we said that in light of what the Supreme Court had said, that we can't take 12B and just say you can't plead on information and belief alone and then that's not enough. Yes, Your Honor. And we said that under some circumstances, the information is solely in the control of the defendant originally, such that the plaintiff can't know when they plead. Now, what you're hearing from the plaintiff in their argument is essentially that. They're saying, we plead on information and belief that there were discussions held between the other co-defendants related to Nurse Young's characterizations and that they were aware that there was hostility towards, and that's pled, right? And that that's enough at the pleading stage to get us to do discovery because we have no control. We weren't present when those discussions took place. We couldn't be present when those discussions took place. We have not yet been afforded the opportunity to conduct discovery, which you're saying they could have done. But that's their argument. And see, to me, when I look at this particular information and belief thing, there's a lot of tension because I don't think that we intended Ahearn to just swallow all the things we've said about pleading historically. On the other hand, we clearly say that there's some body of facts out there that are in control of one party who bears the burden of not pleading. And the party with the burden of pleading is saying, we need discovery but we believe this happened. And so why isn't it that case? Yes, Your Honor, I do believe that this case is different than Ahearn because of the sheer fact that that was a private company as opposed to St. Louis County being a governmental entity subject to the Sunshine Laws of the State of Missouri. And the fact of the matter is that this appellant was able to get enough information to name 18 defendants, to reference jail footage, video of Mr. Ketchings in the jail, and other things. Was the video referenced in the complaint? Is the video referenced in the complaint? I believe that the appellant did state in the complaint that you could see Mr. Ketchings slide down the jail wall. So the video was referenced. Was the video any way in the record at the district court? Yes, Your Honor, in that it was... I'm sorry, the video itself, no, Your Honor, it was not. Okay, what was it? Something's at the district court. What was at the district court about the video? Well, no, I'm sorry. Not the video in that the video was not provided to the district court, but again, I do believe, if I remember correctly, that the pleading did state that you could see Mr. Ketchings on surveillance footage sliding down the jail wall. Okay, so it was referenced in the complaint, but it's not anywhere else in the district court record. Correct, Your Honor. And even in the Young case that continued, it's not in that record either? Oh, sorry, Your Honor. I actually cannot recall, Your Honor. I would have to look into that, whether or not it was included in the later parts of discovery. But, Your Honor, even though the argument... Sorry, even though this court primarily considers arguments and facts that were before the district court, the fact of the matter is that, as Judge Benton just pointed out, this case did continue uniquely for a year after these appellees were dismissed. And presumably, as Appellant has tried to enter many things into the record that should not be before the court at this stage, that still consists of her best evidence, presumably, of what occurred in this case. And it still does not rise to the level of deliberate indifference on the actions of each of these individual employees. Appellant referenced the affidavit of Lieutenant Moeller. In his affidavit, Lieutenant Moeller stated that he found out Mr. Ketchings was even ill six days before he died, and that he only ever had two interactions with him. That does not rise to the level of deliberate indifference. It does not rise to the bright lines. Transgressing the bright lines this court has referenced in past cases. And he's the one who asked for help, right? Correct, Your Honor. And outside of those... Does the complaint say who he asked for help? It does not specifically reference who he asked for help. I'm sorry. I know at one point it references that he asked Nurse Young to schedule... Yes.  Mr. Ketchings for clinical appointments with a physician. However, Your Honor, if... If Appellee, who is a non-trained medical professional, is told by a medical professional that they will schedule an individual for clinic, there is no reason for him to reasonably believe that would not occur. And what about Williams? When did Williams find out, and what did Williams do? Your Honor, that is not specifically referenced in the complaint or the subsequent pleadings. Is that from the Young case we know about Williams? What we know about Williams is not... I'm sorry, I should say it's not any specific time frame. The evidence provided in what was subsequently discovered in Young, she does reference having known at some point in February that he was ill. However, again, that does not mean that she knew that he had a serious medical need. Case law references that you can know someone is ill and their condition not be per se obvious to a lay person. As I can see, my time is coming to an end. I will leave the Court with this. The fact of the matter of this case is that it is a tragedy that Mr. Ketchings died, and appellees in no way mean to disregard or dismiss that reality. However, two things can be true at once. It's both true that it's a tragedy that Mr. Ketchings died, and it's true that these appellees are not liable for his death. We ask that you uphold the finding of the District Court. Thank you. Thank you, Ms. Britt. Mr. Atkinson. Thank you. May it please the Court. I've been assigned five minutes. I'm not sure I have that much time, so I'm going to go briefly through this. You've got five minutes. I'm going to try to use less than that, Your Honor. I represent Dr. Emily Doucette. She was a physician at the time of the events in this case. She was the co-director, acting co-director maybe, of the Department of Public Health for St. Louis County. She did not have any active role in the care and treatment of Mr. Ketchings. She was not on the scene either before or afterwards for several days. There was a hierarchy between the nursing, the guard staff. There were medical directors who were named as John Does, were never named individually as defendants, and Dr. Doucette fell above that. In the absence of a doctor-patient relationship between Dr. Doucette and Mr. Ketchings, we're looking at a supervisory liability. There's one remaining count that's been brought here. It's count seven of the petition, which alleges that Dr. Doucette, as well as other defendants, failed to properly supervise, failed to properly train, and failed to properly discipline Nurse Young as well as the other nurses. For purposes of my argument, I focused on Nurse Young, mostly because Nurse Young, the case did proceed against him compared to the other defendants. I think that if the court finds that it was not accurate in the position of pleading as it relates to Nurse Young, with Dr. Doucette, it wouldn't apply to the other nurses as well. So with that in mind, we have two issues here when we're looking at a supervision situation. And that is whether there is notice of unconstitutional acts committed by a subordinate. From our purposes and our appeal here, we're not going to address that issue. We'll concede that point here with the opposing counsel. But there must be some signs of deliberate indifference or tacit authorization of those acts. And there is none of that included within plaintiff's pleadings. The complaint does say that standing orders were ignored, right? Correct. Is that enough? Absolutely not. If the doctor knows that they're doing standing orders to have something done, some particular drug, that's not enough? No, Your Honor, and here's why. It's because in those circumstances, the notice requirement as set forth in multiple cases by the Eighth Circuit requires is a rigorous scrutiny. It is subjective to the individual. So there has to be some indication, not just a boilerplate or threadbare statement, that Dr. Doucette knew about these things, but there needs to be some sort of factual allegation to support that. The only allegations of negligence, or excuse me, of notice, I apologize, we're not here talking about negligence. The only allegations of notice as it relates to Dr. Doucette is in reference to she should have been aware of media reports and county counsel notes. They made that allegation. They also seem to make an allegation at one point of factual allegations that she was under some duty to review the charting of these nurses, and if she'd have done that, then she'd have known that they were used kind of ignoring her standing orders. And I'm trying to figure out what evidence there is that that's something more than a paraconclusion. Two things, Judge. One is that there is no evidence included in there. Secondly, and actually it was towards my later argument here because I didn't think we were going to necessarily get to that, as part of the appeal, Appellant's counsel raises the issue of Section 334 of Missouri Revised Statutes. That deals with collaborative practice agreements or collaborative practice arrangements between physicians and physician extenders. In this case, that could be nurses. It could also be PAs or nurse practitioners. That's a written agreement, and there is no such written agreement in this case. I can represent to that. It wasn't alleged in the petition. Nothing as such in that existed. That Chapter 334 is generally designed for rural health care situations when you've got one local doctor and you've got one or two doctors in the entire county, and they hire these extenders with the idea that, you know, we're going to go out to some of the further reaches and we're going to have a nurse practitioner there, a nurse present, and that's when they have a duty to review 10% of those patient files. That's not the situation here. Not raised exactly in the petition itself, and furthermore, it's part of the appeal. It's not applicable to a lot of the circumstances. I do want to go back to the rigorous standard a little bit because we've got some various cases that we've cited, appellants cited as well. As I was trying to sort through this, it's a little bit of a Goldilocks argument. You know, we can't be too hot. We can't be too specified. We're not going to require a plaintiff to make that specified of an allegation from the onset. On the other hand, it can't be too cold. It can't be too generalized. And there's a variety of cases of it. You've got the Criggin case, which dealt with a specific jailer, and the issue at that point in time was whether or not the administrator specifically knew about that individual's conduct. One of the issues brought up as part of the appeal here is that that case was incorporated by Judge Sippel and relied upon the Davis case, saying that, well, gee shucks, you're asking an unreasonable standard that Dr. Doucette somehow had to know that Nurse Young, and Nurse Young alone, was committing unconstitutional acts, and therefore, because you didn't know that, well, Dr. Doucette should win. I'm not sure that's exactly the case, frankly. It's probably a broader standard. The reality of it is that Dr. Doucette didn't have any notice or certainly is not alleged of having any notice of unconstitutional acts by any of the staff. Well, does it matter that the absence of knowledge or the absence of notice is attributable to Dr. Doucette by not doing what the doctor was responsible to do? Well, Your Honor, one, I don't think there's any allegations in the petition that Dr. Doucette didn't do something that she was supposed to do. So that in and of itself is devoid in this petition. I thought she was, well, not reviewing the charts to see that her orders aren't being followed. One is not, Judge, that's not what's pled. And furthermore, as I think I answered with Judge Erickson's question, that specifically resolves with collaborative practice agreements in Chapter 334. That's not the circumstance that we have here. Now, what I would say is that, actually, I kind of lost my train of thought there in regards to notice. Here's what the other thing I was going to say, Judge, is that in regards from a notice element, there needs to be, it's a rigorous standard, there needs to be some real concrete detail alleged in the petition. Some of the cases that we cite in there, mind you, they're at summary judgment level, they're not at 12B6 level. But some of the cases where they had affidavits from detainees and the court said, that's not enough. One of the other cases, and I believe it is, I'm going to apologize here, I believe it's actually the Davis case itself, where two of the, they were not health care providers, but the jailers and the county administrator, they said, well, they were named in prior lawsuits, surely that gave them notice. And even in that instance, the court said, no, that's not enough. And in particular, because of the circumstance, that was denied. So consequently, there needs to be some rigorous allegation here. There needs to be something to support that Dr. Doucette had notice, and that's not present. Consequently, in the absence of any notice, we do not believe that there was any 1983 violation by Dr. Doucette. Consequently, I would ask this court to please affirm the trial court's decision in granting our motion to dismiss. Thank you. Thank you, Mr. Atkinson. Mr. Petroli, your rebuttal. So first, I'd like to discuss the issue of notice with Dr. Doucette. The pleadings are substantial, and they go well beyond county council meetings. They say that she was involved in morbidity and mortality reviews, post-death investigations of others. And then at that time, she knew that the nurses were not following her standing orders. She knew that it was chaos. She knew that no one was doing what they were supposed to do. And she knew she had a duty to supervise her employees. Now, we're not saying that because of the state statute. We're saying that because of the federal law, that she had a duty to supervise these employees. The state statute just shows additionally that Missouri also thinks that doctors should also supervise their employees and their nurses in these large institutional settings. This isn't just rural medicine. This is institutional medicine. That's where it's most important to have supervision, is when you have 1,000 people being treated by one doctor who's in charge of all of these nurses. So then the next question is, is now that we know that notice has been pled, was she deliberately indifferent to her obligations to supervise? And for that, Your Honors, we can go right to Appendix 392. And the question of the deposition was, in other words, there's no supervision during the treatment. It might occur six months later or eight months later. Answer, that's true. There is no mandatory supervision during the use of the standing order. So here we have the doctor who's essentially admitting in a later deposition, no, I don't supervise any of these folks who are following my standing order, and it's hers. And it's in Mr. Ketching's medical record. It says Dr. Doucette, and she's the signatory of that record. And all three of these practical nurses who came in to see him had circumstances in which they were supposed to call a medical provider immediately. They were supposed to leave his room and call a doctor because of the mixture of symptoms. For example, worse headache of life, dizziness, inability to walk. These aren't things that practical nurses can take care of. These aren't things that nurses can take care of. And in this case, we have practical nurses who aren't even nurses. You mean Ariens Council, they're all licensed, proceed. Yes. Yeah. And they're ignoring, willfully ignoring these orders. And our theory and what we plot is, is it's because there is no supervision and there is no discipline. So they know they're not going to be held responsible for ignoring it. They know they could just leave the room and if something bad happens, they're probably not going to be fired because there is no significant level of supervision. And we plead repeatedly throughout detailed information about her notice and everyone else's notice about the serious medical need and the need to supervise and discipline. And again, all we're asking, and this is not a summary judgment, we're just asking to take evidence. And then to get this case to summary judgment where it can then be sorted out. Thank you, Your Honors. Is there any questions? I don't see any. Thank you, Mr. Padron. Thank you. The court thanks all counsel for participation in argument before the court this morning. It's been helpful. We'll continue to study the briefing and render a decision in due course. Thank you. Thank you. Thank you. Madam Clerk, would you call case number three, please?